# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

COMERICA BANK,

        Plaintiff,

v.

VALDNER PAPA and AMEDEO PAPA, JR.,

        Defendants.
_____/

CASE NO. 03-74894

HON. MARIANNE O. BATTANI


BANCO LAVRA,

        Plaintiff,

v.

COMERICA BANK,

        Defendant.
_____/

CASE NO. 03-60200

HON. MARIANNE O. BATTANI


## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS

Before the Court is Plaintiff Comerica Bank's Motion for Summary Judgment on Defendants' Counterclaims (Doc. # 39) in Case No. 03-74895.  After Defendants failed to appear for oral argument, which was scheduled for October 25, 2006, the Court informed the parties that these motions would be decided on the briefs in accordance with E.D. Mich. LR 7.1(e) .  For the reasons that follow, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims.

I.    PROCEDURAL BACKGROUND AND STATEMENT OF FACTS

Plaintiff Comerica Bank ("Comerica") is a U.S. bank with home offices in Detroit, Michigan. Defendants, Valdner Papa and Amedeo Papa, Jr., are former officers, directors, and minority shareholders in Banco Lavra ("Lavra"), a Brazilian bank and financial services institution that is no longer in business. In June 2003, Lavra's trustee filed suit against Comerica, alleging claims arising out of Comerica's failure to purchase Lavra (hereinafter the "Lavra suit").

In September 2003, Comerica filed a counterclaim against Lavra but did not seek to join the Papas as third-party defendants. Instead, Comerica filed a separate lawsuit against the Papas in December 2003. Comerica successfully sought consolidation of the lawsuits after the discovery period ended in the Lavra suit.

Defendants' Counterclaim advances six causes of action: four advanced by Lavra in the companion case, fraud, misrepresentation, breach of fiduciary duty, and quantum meruit; and two new claims, negligent hiring/supervision and promissory estoppel. The facts as articulated below were set forth in the Court's October 5, 2005, Opinion and Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment in the Lavra suit, wherein the Court awarded summary judgment to Comerica on Lavra's breach of contract claim, breach of fiduciary duty claim, and fraud claim.[1] The Court finds the facts relevant to the resolution of the issues raised in this motion.

> In 1998, Comerica's International Finance Division, directed by Douglas Ransdell, and Ralph Heid, head of the Latin America Group, decided to explore opportunities in Brazil. They asked Z.

---

[1] The Court subsequently granted summary judgment on Lavra's claim of *quantum meruit*.

Susan Guarda Garrity ("Guarda"), a vice president responsible for Comerica's lending customers having loans or operations in Brazil, to mine her contacts. At that time, Comerica did not have its own office in Brazil, and its transactions were limited to exchanges processed through a variety of correspondent banking relations.

Guarda knew David Figueiredo, the head of the International Department at Lavra, and she told him that Comerica was entertaining the idea of launching a Brazilian platform. Def.'s Ex. 11, Guarda Dep. at 111-12. Figueiredo took this information to Amedeu Papa, Sr., who was president of Banco Lavra. The bank was part of a conglomerate of companies controlled by the Papa family. See Def.'s Ex. 3. In 1998, four brothers, Amedeu, Sr., Valdner, Marcio and Jose, Jr. owned 11.63% of the stock of the principal holding company. Their parents owned 53%. Amedeu Papa, Sr. managed the bank until his death in June 1999. His son Amedeo Papa, Jr. took over management at that time. Def.'s Ex. 5, Sergio Tamouki Dep. at 297.

In March 1998, Guarda and some of the shareholders of Lavra, including Amedeu Papa, Sr., Marcio Papa and Valdner Papa, engaged in preliminary discussions about Comerica's possible acquisition of Lavra. Amedeu Papa, Sr. indicated he would be interested in selling a "minor part of Lavra," but that more discussions would have to take place. Def.'s Ex. 11, Guarda Dep. at 115-16.

On April 17, 1998, Ransdell, Heid, and Guarda from Comerica, and Amedeu Papa, Sr., Valdner Papa, and Amedeo Papa, Jr. met in Miami. Comerica made a presentation concerning the costs and benefits of a proposed acquisition. Am. Compl. at ¶ 15.

During the same time period, Comerica representatives had also instituted communications with members of the Brazilian Central Bank ("BACEN") in Brasilia. Am. Compl. at ¶ 17. The discussions included efforts by Comerica to negotiate the "toll" payable for obtaining a license to start a new bank. Because the toll for a new bank at that time was $10,000,000 for the license alone, Lavra was an attractive acquisition target.

After the April meeting, further discussions of the terms of an acquisition took place. In May, the same people met in Sao Paulo, Brazil to "brainstorm." Def.'s Ex. 7, Amedeo Papa, Jr. Dep. at 249. Amedeo Papa, Jr. characterized discussions as "very, very preliminary." Id. Valdner Papa suggested an arrangement with four

phases. Def.'s Ex. 9, meeting agenda. The phases went from provision of a credit line to minority ownership, to majority ownership, to consideration of the sale of the entire bank. See id. The proposal afforded flexibility to Comerica: it could do as much or as little as it wanted. Def.'s Ex. 8, Marcio Papa Dep. at 505-06.

According to Valdner Papa, at the meeting an oral agreement was reached for an acquisition price that was 65% of Lavra's value, which at that time, was $34.5 million. Def.'s Ex. 6, Valdner Papa Dep. at 407-09 (testifying that a price condition was established). Valdner Papa reached this conclusion when the proposal was made because Comerica's representative remained silent. Id. Lavra's shareholders agreed to stay at the bank for 3 to 5 years after completion of the acquisition. Am. Compl. at ¶ 15. According to Comerica, after the meeting Ransdell said he would "start talking about" presenting Lavra as a possible acquisition candidate. Def.'s Brief in Support of Motion for Summary Judgment at 5.

On July 6, 1998, representatives of the parties met again. Joe Buttigieg, Executive Vice President of Comerica, was in Brazil and attended the meeting. The parties dispute what happened after the meeting. According to Lavra, Guarda assured Lavra's shareholders that the acquisition was a "done deal" and "shook hands" on it. Am. Compl. at ¶ 18. Then Guarda requested, and Lavra provided, internal and confidential information. Id. at ¶ 19. In contrast, Comerica claims that Guarda only represented that the proposed acquisition had been accepted by the International team and that it would be presented to the executive committee. In her June 21, 1998 letter to Amedeo Papa, Guarda discusses the demanding and lengthy process in dealing with Comerica. Def.'s Ex. 16. She subsequently faxed a request to Valdner Papa, dated July 14, 1998, requesting "information [that] was needed to in order to present to [its] executive committee [its] recommendation of establishing a relationship with Banco Lavra." Def.'s Ex. 18, Guarda fax.

Thereafter, Ransdell presented a proposal to senior management for "approval to undertake due diligence regarding the purchase of a controlling interest in a small Brazilian commercial bank." Def.'s Ex. 21. At the September 16, 1998 meeting, the Chairman of Comerica, Eugene Miller, wrote "purchase of a bank is dead for the time being;" Am. Compl. at ¶ 21. Nevertheless, the committee did approve the establishment of a "representative office" in Brazil. Am. Compl. at ¶ 20.

Ransdell asserts that he informed the Papas of this decision. There

4

is a dispute as to what information was conveyed. Guarda did inform Lavra that due to a "financial crisis in Asia, any acquisition would be delayed. Later, she told Lavra it would be delayed again due to the Russian "financial crisis. Am. Compl. at ¶ 20. Without question, the precise content of Miller's note was not revealed to the Papas, but they certainly were informed that a decision to purchase was not made.

Guarda subsequently suggested that the parties should exchange final documents so the acquisition could be finalized when the international financial markets settled down. AC at ¶ 22. Ransdell and Guarda told Amadeo Papa, Marcio Papa, and Valdner Papa, that Comerica would sign a Strategic Alliance to show their good will and good faith.

Comerica and Lavra entered into a Strategic Alliance Agreement ("SA") on October 13, 1998. The SA provides that its purpose is "to create optimum conditions for good customer service. . .to improve existing customer relations and participate in new opportunities of mutual benefit to both participants." Def.'s Ex. 23. Another relevant provision includes that the parties agree "at their [sic] sole discretion, to use each other's products and services when reasonably possible and consistent with their other business relationships in the conduct of business involving [clear] payments, commercial trade letters of credit, collections, closing of. . .exchange, foreign exchange and such other business opportunities that are of interest to both participants." Id. They agreed to "share 50/50 on revenues and fees earned on the Brazilian side of transactions on corporate relationships introduced by Comerica to Banco Lavra. . . ." Id. In addition, each party retained the right to decline to participate in a proposed transaction and could terminate the agreement with three months notice. Id.

After the SA was signed, Guarda presented a three-page document titled "Transactions to be Closed under Strategic Alliance between Banco Lavra and Comerica Bank" (Transactions Attachment). Def.'s Ex. 24. The Transactions Attachment lists existing Comerica customers, types of services provided, and the amount of Comerica's then-existing loan facility with each customer. See id. All signatories to the SA initialed the Transaction Attachment. Id. The relationship between the parties continued. In November 1998, Buttigieg, Heid and Guarda traveled to Brazil and made joint customer calls. Throughout the time period immediately following the signing of the SA, Guarda made numerous customer calls with Lavra officers.

5

In February 1999, Comerica leased space from Lavra, and Guarda used the space as headquarters for Comerica's representative office, Comerica do Brasil. Am. Compl. at ¶ 28. Throughout this timeframe, Comerica kept in regular contact with BACEN, discussing the toll charge if Comerica were to purchase a bank and trying to convince BACEN to waive it. Id. Yet, Guarda attended some BACEN meetings with representatives from Lavra. According to Amedeo Papa, Jr., Guarda represented to BACEN that Comerica had a firm intention to pursue an acquisition, but due to the volatility of the financial market, the board had not yet approved the purchase.

In May, 1999, Miller was in Brazil for the grand opening of the representative office. He indicated that Comerica was interested in acquisition, but any purchase was subject to Board approval. Def.'s Ex. 7, A. Papa, Jr. Dep. at 243-44.

On April 28, 1999, BACEN ordered Lavra and its accounting firm to appear before BACEN's Inspection Department. Def.'s Ex 1. Adjustments to Lavra's balance sheet were demanded in February 1999, and Lavra was left with a negative net equity. Id. BACEN mandated an injection of capital or a plan to bring the bank within regulations for liquidity and reserves. Id. BACEN subsequently warned Lavra that failure to comply could result in legal penalties. Id. Lavra did not provide a copy of this document to Comerica, and the parties dispute the extent to which information regarding Lavra's financial health was disclosed to Comerica. Def.'s Ex. 7, A. Papa, Jr. Dep. at 710, 802 (admitting that he never mentioned the negative net worth).

Also, during this timeframe, Ransdell and Heid again prepared for a purchase presentation to senior management. Buttigieg asked Guarda to prepare a list of keepers–employees who Comerica should retain post-acquisition. Heid drafted a new formal presentation for senior management in July 1999, in which he recommended initiating due diligence with a "view to purchasing Lavra." Def.'s Ex. 32. At an August 9, 1999 meeting, Comerica's president, Eugene Miller, Buttigieg, and Ransdell outlined concerns that had been raised over the potential deal. Def.'s Ex. 33. At that time, Comerica also learned that the law regarding foreign ownership of banks in Brazil had changed, and it might be possible to obtain a license for a new bank without buying an existing bank. Def.'s Ex. 11, Guarda Dep. at 371-72. Senior management decided that both options--purchase of an existing bank or opening a new bank--should be explored. Ransdell and Guarda met with BACEN

on August 13, and 16, 1999, to pursue the opening a new bank option. Mark Yonkman, an attorney for Comerica, also went to Brazil and met with BACEN governor Sergio D'Arcy on August 18, 1999, to explore the purchase of an existing bank. At the meeting, D'Arcy confirmed that purchase of Lavra stock and assets would expose Comerica to successor liability. Def.'s Ex. 15, Heid Dep. at 37-8.

On August 27, 1999, BACEN gave Lavra 15 days to present a definite proposal for sale of the bank to Comerica or another institution. On August 30, Marcio Papa sent a letter to Comerica requesting a "definite and formal statement" from Comerica regarding its interest. Def.'s Ex. 34. At a conference call held September 2, 1999, Comerica indicated that it would not purchase Lavra. Lavra entered voluntary liquidation on September 20, 1999. Def.'s Ex. 35.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's

case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence itself need not be the sort admissible at trial. Tinsley v. General Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000). However, the evidence must be more than the nonmovant's own pleadings and affidavits. Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001). The mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. Anderson, 477 U.S. at 252.

### III. ANALYSIS

Before considering the merits of the dispositive motion, the Court addresses Defendants' request to strike Comerica's motion because its brief exceeds the page limits established in the local rules. The Court finds no reason to strike Plaintiff's motion. Plaintiff's brief does not exceed the page limit, but it does incorporate previous pleadings and decisions entered in the companion case. The inclusion of these pleadings violates neither the letter nor the spirit of the rule. Accordingly, Defendants' request is DENIED.

#### A. RES JUDICATA

Comerica asserts that the doctrine of res judicata bars relitigation of Defendants' counterclaims, including those claims advanced by Lavra in the companion case as well as the two new claims. In resolving the applicability of the doctrine, this Court looks to Michigan law. Semtek Int'l v. Lockheed Martin Corp., 531 U.S. 447, 508-09 (2001).

Res judicata "bars a subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been resolved in the first." ANR Pipeline Co v. Dep't of

9

Treasury, 699 N.W.2d 707, 720 (Mich. Ct. App. 2005) (citing Adair v. Michigan, 680 N.W.2d 386, 396 (Mich. 2004). Although different parties were involved in these two actions, the doctrine bars a subsequent action not only by the same parties but also by "their privies." Adair, 680 at 396. Moreover, the doctrine "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." Id.

Here, the parties contest whether the second element can be satisfied. The Michigan Supreme Court has defined privity as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." Sloan v. City of Madison Heights, 389 N.W.2d 418, 422 (Mich. 1986) (quoting Petersen v. Fee Int'l Ltd., 435 F.Supp. 938, 942 (W.D. Okla. 1975). Michigan courts require "both a substantial identity of interests and a working or functional relationship. . .in which the interests of the non-party are presented and protected by the party in the litigation." Phinisee v. Rogers, 582 N.W.2d 852, 854 (Mich. Ct. App. 1998) (internal quotations omitted). Consequently, the Court must discern whether Papas' interests were so closely aligned with Lavra's that they were adequately protected in the Lavra suit.

According to Papas, they lost millions by relying on representations made by Comerica, and but for Comerica's conduct, they would have made millions selling their shares and interest in Banco Lavra. They conclude that, because Lavra's Trustee had no interest in pursuing their individual claims, they were not protected in the consolidated lawsuit.

Here, despite Papas' assertion, there is no evidence that their interests were not

10

adequately protected.  The very nature of their relationship with Lavra creates a virtually unassailable alignment of interests.  Controlling case law provides,

> Stockholders of a corporation may rely on and are bound by the final judgments, orders and decrees for or against the corporation, and this is usually true regardless of whether or not the stockholder was a party to or active participant in the original litigation. . .[A] stockholder is normally so far deemed an integral part of the corporation in which he holds stock that in the eyes of the law he is regarded as privy to all judicial proceedings affecting the body of which he is a member, whether for good or ill.

Knowlton v. City of Port Huron, 94 N.W.2d 824, 827 (Mich. 1959).  In Wildfong v. Fireman's Fund Ins. Co., 448 N.W.2d 722, 724 (Mich. Ct. App. 1989), the court found privity between a family-owned corporation and the individual family members inasmuch as the plaintiffs had a "direct interest in the initial lawsuit filed by this family-owned corporation; the plaintiffs had a right "to control the proceedings in that lawsuit and did control them."  Id.  The court reasoned that although the plaintiffs were not named individually in the lawsuit, for all "intents and purposes were parties to that suit, [the p]laintiffs, as owners of all of the corporation's stock, stood to gain or lose the most in the initial lawsuit against defendants."  Id.

The fact that Lavra was in bankruptcy does not alter the outcome of the privity analysis.  Banco Lavra is a closely-held, family-owned corporation.  Valdner Papa and Amedeo Papa, Jr. participated in the Lava lawsuit.  The were deposed, provided affidavits, and participated in a court-ordered settlement conference.  Amedeo Papa, Jr. acted as Lavra's first liquidator and brought suit against Comerica in Brazil.  See Pl.'s Ex. G, H.  Valdner Papa attended the deposition of his brother Marcio, as the "corporate representative" of Lavra.  See Pl.'s Ex. I.  These facts undermine Papas' argument that they did not control the Lavra litigation as does the evidence cited by Comerica of e-mails

between Lavra's counsel wherein counsel claims he had not spoken with the Trustee (Pl.'s Ex. D, Brewer Dep. at 18), and the Trustee was not a party to the lawsuit (Pl.'s Ex. F); that Lavra's counsel met with Papas; and that Valdner Papa met with the liquidator about the U.S. litigation (Pl.'s Ex. C, Valdner Papa's Dep. at 230, 244). In this case, there is ample evidence that Defendants, as officers, directors, and shareholders of Lavra, shared a substantial identity of interests and a working relationship with Lavra.

Further, the Court is not persuaded a different outcome is required in light of Papas' contention that different proof is involved. They claim that the proof of their reliance is demonstrated by their failure to sell personal shares and interests in Lavra. Although their damages are different, this would hold true for any stockholder in a corporation. This does not impact the privity analysis.[2] Bates v. Township of Van Buren, 459 F.3d 731 (6th Cir. 2006).

## B. NEGLIGENT SUPERVISION AND/OR PROMISSORY ESTOPPEL

Even if the doctrine of res judicata did not bar Papas' claim of negligent hiring/supervision, it fails as a matter of law.[3] Papas offer the personnel files of Comerica's

---

[2]To the extent that Papas assert that their new claims are not barred by the doctrine, the Court disagrees. "The test for determining whether two claims are identical for res judicata purposes is whether the same facts or evidence are essential to the maintenance of the two claims," Huggett v. Dep't of Natural Res., 590 N.W.2d 747 (Mich. Ct. App. 1998), not whether the grounds asserted for relief are the same. Jones v. State Farm Mut. Auto. Ins. Co., 509 N.W.2d 829 (Mich. Ct. App. 1993), modified on other grounds, Patterson v. Kleiman, 526 N.W.2d 879 (Mich. 1994). In this case, the conduct of Comerica's employees, Ralph Heid and Susan Guarda, was part and parcel of Lavra's claim of breach of fiduciary duty as well as its claim of fraud.

[3]Papas do not address the promissory estoppel claim. Even if they have not abandoned the claim it cannot survive Comerica's motion. This Court already has held in the Lavra suit that Comerica made no promise; and if it did, Papas did not rely upon it; and even if

employees with whom Lavra did business to support this counterclaim. Papas conclude that the negligent supervision caused them irreparable injury in that both the value of their ownership interest in Lavra and their personal net worth were completely destroyed.

To establish a prima facie case of negligence, Papas must prove four elements: that the [counter]defendant owed a duty to the [counter]plaintiffs, that the [counter]defendant breached that duty, that the [counter]defendant's breach of duty was the proximate cause of the [counter]plaintiffs' damages, and that the [counter]plaintiffs suffered damages. Terry v. Detroit, 573 N.W.2d 348, 352 (Mich. Ct. App. 1997). An employer has a duty to protect an individual from harm by an employee under certain circumstances; however, whether such a duty exists is a question of law for the court to decide. Id.

After a review of the relevant caselaw, the Court finds such a duty does not exist here. The cases imposing a duty typically involved situations wherein an employee commits an attack on a third person. Papas have not advanced any case law analogous to the claim they make here. In reaching this determination, the Court considered the "foreseeability of the harm, degree of certainty of injury, existence of a relationship between the parties involved, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm and burdens and consequences of imposing a duty, and the resulting liability for breach." Terry, 573 N.W.2d at 352. Even if the evidence demonstrates that Comerica knew or should have known of its employee's propensity to engage in the challenged conduct, the conduct at issue here is identified as acquiescing in allowing employees to act without management approval, failing to keep

---

they had, such reliance was unreasonable.

informed about the potential acquisition of Lavra, and failing to prevent employees from "getting to close to " the shareholders and management of Lavra.  See Counterdefs.' Brief at 13-14.  Michigan courts have not required employers to insulate third parties from an employee's poor job performance.  Here, the harm is financial and the relationship between Comerica and the Papas was a business relationship.  The other factors considered in imposing a duty likewise do not favor finding one here.  Comerica's conduct was not particularly blameworthy.  More importantly, under Defendants' legal theory, Comerica would owe a legal duty in tort to the world to ensure that every employee of the business does a good job in performing his assigned tasks regardless of whether a tort had been committed.

### C.  STATUTE OF LIMITATIONS

Even if the Court had reached a different conclusion regarding the applicability of res judicata, the statute of limitation bars affirmative recovery on Defendants' counterclaims.  Pursuant to MICH.COMP.LAWS § 600.5827:

> Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

Based upon this statutory language, the Michigan Supreme Court held, in Boyle v. General Motors Corp., 661 N.W.2d 557, 560 (2003), that the discovery rule does not apply to cases alleging fraud.

The parties relationship ended on September 3, 1999, when Comerica informed Lavra by letter that no purchase would occur.  Papas' claims, which have limitation periods of six years or less, accrued at that time at the latest.  Papas filed their counterclaims on

March 31, 2006, over six years after the letter was sent. Therefore, affirmative recovery is barred.

## V.  CONCLUSION

In sum, the Court **DENIES** Papas' motion to strike and **GRANTS** Comerica summary judgment on the counterclaims.

**IT IS SO ORDERED**.

                                             s/Marianne O. Battani
                                             MARIANNE O. BATTANI
                                             UNITED STATES DISTRICT JUDGE

Dated: <u>December 21, 2006</u>

## CERTIFICATE OF SERVICE

Copies of this Order were mailed to J. Mark Brewer and Thomas J. Tallerico on this date by ordinary mail and/or electronic filing.

                                             s/Bernadette M. Thebolt
                                             Deputy Clerk